**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:08-CR-12-TS |
| | ) | |
| JAMES L. GOVAN | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant James L. Govan's Motion to Suppress Evidence [DE 13], filed on April 7, 2008. The Defendant contends that when police subjected him to an investigatory stop, they did so without specific and articulable facts sufficient to give rise to reasonable suspicion that he had committed a crime. Additionally, he states that, even if the stop was justified at its inception, the conduct of police officers to detain him was not reasonably related to the circumstances that justified the interference in the first place, and the stop evolved into an arrest that was not supported by probable cause.

**BACKGROUND**

By way of an Indictment filed on February 27, 2008, the Government charges, that on January 19, 2008, James Govan possessed with intent to distribute crack cocaine (21 U.S.C. § 841(a)(1)), carried a firearm during and in relation to the drug trafficking crime (18 U.S.C. § 924(c)), and possessed a firearm having been convicted of a felony (18 U.S.C. § 922(g)(1)). On April 7, the Defendant moved to suppress "items illegally seized from him at the time of or subsequent to his arrest." (Mot. Suppress 1, DE 13). The Defendant argues that law enforcement officers did not have reasonable grounds to believe that he had committed any offense or observe him in the commission of a crime. On April 11, the Government responded, disputing the

Defendant's version of events and stating that an evidentiary hearing was necessary to resolve issues of fact.

On June 19, the Court conducted an evidentiary hearing on the Motion to Suppress. The Defendant was present and represented by attorney Stanley Campbell. The Government was represented by Assistant United States Attorney Anthony Gellar. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs.

On September 23, the Defendant filed his post-hearing Brief in Support of Motion to Suppress [DE 24]. The Government filed its post-hearing brief on October 22 [DE 25], and the Defendant replied on October 31 [DE 26].

**FINDINGS OF FACT**

Upon consideration of the credibility of the witnesses, the Court makes the following findings of fact.

Officer Chris Drake has been an enforcement officer with the State Excise Police for more than eleven years. In the course of his duties, he ensures that businesses selling alcohol and tobacco comply with state laws governing the sale of those items. Shortly before midnight on Friday, January 18, 2008, Officer Drake was positioned in an unmarked SUV across the street from a Belmont Beverage store in Fort Wayne, Indiana, with his partner, Officer Schwartfager. The area in front of the store was well lit by street lights and an illuminated store sign, and the officers, who also used binoculars, could see the front entrance to the store.

Officers Drake and Schwartfager noticed two men walking toward the liquor store. The

two men appeared to be under the age of twenty-one and, as such, would have been prohibited by state law from entering the liquor store. As the two men reached the front of the store, the officers saw them face each other and extend their hands out, as if exchanging something between them. One of the men, later identified as Marquelle Marsh, entered the Belmont Beverage store. The other man stayed outside and leaned up against the side of the building near a telephone booth, out of the store clerk's view. The man who stayed outside was later identified as the Defendant, James Govan. When Marsh came out of the store, the officers observed the Defendant walk to meet him and the two men face each other and make motions with their arms and hands that appeared to indicate a second exchange between them.

Given the close proximity of the two men to each other, neither officer could see or identify any item exchanged between Marsh and the Defendant. However, based on their training and experience. they believed that they had witnessed the misdemeanor offense of furnishing, which occurs when a person who is older than twenty-one purchases alcohol to give to someone who is under the legal drinking age. The officers were aware that some alcoholic beverage containers sold in liquor stores are quite small and could be discretely passed from one person to another in the manner the officers observed. As Marsh and the Defendant began to walk away from the store and angle across the street, the officers pulled their vehicle behind them with their emergency lights on. The officers got out of the SUV, identified themselves, described what they had observed outside the liquor store, and asked Marsh and Govan for identification. Officer Schwartfager was focused primarily on Marsh, and Officer Drake on the Defendant.

Officer Schwartfager had no problem getting identifying information from Marsh and discovering that he was only twenty years old, which confirmed his original impression that

Marsh was younger than twenty-one. Marsh claimed that he bought condoms, not alcohol, and showed Officer Schwartfager the condoms and a receipt. Officer Drake did not have the same success with the Defendant, who stated that he did not have any identification. The Defendant told Officer Drake that his name was Marcus Williams and that he was born on March 17, 1985. The Defendant testified at the suppression hearing that he initially refused to give Officer Drake any name, telling him that the matter under investigation (Marsh going into the liquor store) had nothing to do with him. Officer Drake testified that he wanted the Defendant's information because he was a witness to an underage person going into a liquor store.

Officer Drake searched the Indiana Department of Motor Vehicle records for a "Marcus Williams" born on March 17, 1985, but found no person with that name and date of birth. Understanding that his database was limited, Officer Drake contacted Fort Wayne Police Officer Chris Hoffman, who had an in-car computer that could search the Spillman system.[1] Officer Hoffman's search for a black male named Marcus Williams and a birth date of March 17, 1985, was likewise unsuccessful. Officer Hoffman immediately ran a second check using only the date of birth, race, and gender provided by Officer Drake. He suspected that the information the Defendant provided to Officer Drake was false, but that the second check would produce results because, in his experience, people seldom lie about their birth dates because it is too difficult to remember a fictional date. Officer Hoffman's search revealed more than one person matching the description, but he took a closer look at the only person with an active arrest warrant, James Govan. Officer Hoffman had a picture of Govan and learned that he had an identifying scar over

---

[1] Officer Hoffman testified that ninety-five percent of all people in the Fort Wayne area are in the Spillman system because it records any interaction with law enforcement in Allen County, including such mundane activities as parking tickets and animal control incidents.

his left eye. Officer Hoffman relayed this information to Officer Drake and said that he would be at his location soon.

Upon learning this information, Officer Drake asked the Defendant to remove his hat and glasses. Officer Drake observed a scar above the Defendant's left eye. Officer Hoffman arrived, confirmed that the Defendant's appearance was similar to the picture of Govan, and asked the Defendant for his social security number. The Defendant provided a social security number that switched two of the numbers from his real social security number. Officer Hoffman arrested the Defendant on the warrant and for false informing. When Officer Hoffman patted the Defendant down for officer safety, he discovered two small baggies: one was later identified as crack cocaine and the other as marijuana. After being transported to lock-up, a secondary pat down revealed a handgun and a notification from the Warrants Division advising the Defendant of the active warrant for his arrest.

According to the Defendant and Marsh, about twenty minutes elapsed from the time when the officers stopped them to when the officers discovered the outstanding warrant and arrested the Defendant. At some point during the stop, after the officers learned that Marsh was only twenty years old, the officers asked Marsh and the Defendant to walk across the street to the liquor store. The officers moved the location of the stop for two reasons: to get out of the middle of the street; and to follow-up with the liquor store employees about serving an underage patron. At this time, Officer Drake had not yet confirmed the Defendant's identity.[2]

---

[2] Marsh and the Defendant both testified that the Defendant had not yet provided any name, false or otherwise, to the officers when they moved across the street to the liquor store parking lot. Marsh testified that after they crossed the street, Officer Schwartfagen accompanied him into the store to talk to the employees about his age, and that this took about five minutes. He stated that when he came out of the store, Officer Drake was still trying to get the Defendant's information, and that Officer Hoffman was on the scene. Officer Schwartfagen testified that he did not go into the liquor store to talk to the clerks about checking identification and to cite Belmont Beverage for

The Defendant and Marsh, who are cousins, both testified at the suppression hearing that they were never face to face and did not exchange anything either before Marsh went into the liquor store or after he came out. This testimony directly contradicts the testimony of the officers, who offered genuine and believable testimony regarding their observations and their course of action. On the other hand, the Defendant gave officers a false name, and they had to determine his true identity through their own investigation. According to Marsh's own testimony, he heard his cousin give the officers a false name, but did not say anything about it. In 2006, Marsh was also convicted of Invasion of Privacy, after he disobeyed an Allen County court order.

## CONCLUSIONS OF LAW

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, not all encounters between the police and citizens implicate the Fourth Amendment's prohibition against unreasonable searches and seizures. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). The Seventh Circuit has recognized three categories of police-citizen encounters:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief,

---

violating State liquor laws until after the Defendant was in custody on the warrant.
    The timeline presented by Marsh is problematic because it would have required, in a period of less than five minutes, Officer Drake to search his database and review the results, Officer Drake to contact Officer Hoffman, and Officer Hoffman to run two searches in the Spillman system and arrive on the scene. However, because the conflicting evidence regarding when the Defendant provided the fake name and when Marsh was escorted into the liquor store are not outcome determinative, the Court will not resolve these disputes.

> non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*Id.* at 836 (citing *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citation omitted)).

Both the Defendant and the Government analyze the stop under the second category of police-citizen encounters. The Defendant argues that the police officers' actions were not justified by reasonable suspicion sufficient to justify an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). He argues that, even if the initial stop was justified, it was not reasonably related in scope to the circumstances that justified the interference in the first place. He contends that the detention became a de facto arrest when the officers moved the investigation across the street to the liquor store parking lot even though they already knew that the underaged Marsh, not the Defendant, had violated Indiana law by going into the liquor store.

Police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In assessing whether an investigatory stop was supported by reasonable suspicion, a court considers the "totality of the circumstances" as they were presented to the officer at the time of the encounter. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is a "commonsense, nontechnical" concept that

deals with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. at 21–22).

Based on the appearance and demeanor of the witnesses, the Court finds credible the officers' testimony about their observations of the Defendant and his cousin. The Defendant argues that, even if the two men turned to face each other and extended their hands, the officers did not actually see an exchange and thus only "had a hunch that there was some sort of exchange." (Def. Reply 2, DE 26.) He argues that the occurrence of two people facing each other and gesturing with their hands does not qualify as specific and articulable facts giving rise to any kind of reasonable suspicion. (*Id.* at 4.) The Defendant's argument discounts the totality of the circumstances. Even if an innocent explanation exists for the face to face gesturing that appeared to be an exchange, or for any of the other actions when considered in isolation, the combination of factors could still give rise to reasonable suspicion. *See United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007) (holding that "even when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are taken together"); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"). The Court finds the following facts to be specific and articulable facts giving rise to a particularized and

8

reasonable suspicion of furnishing: two people walking side by side to a liquor store around midnight, any one or both of whom could be under twenty-one years old based on physical appearance, turning to face each other and making motions that look like an exchange is occurring, followed by one of them entering the liquor store while the other waits on the side of the building outside the view of any store clerk and out of direct lighting, followed by a second face to face encounter with arms extended before walking side by side away from the liquor store.[3]

The Defendant's argument also ignores the implication of an exchange under the circumstances and as a trained excise officer would view them. *See United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999) (noting that circumstances that appear innocent to the outside observer may suggest criminal activity to experienced officers who assess these circumstances, and make inferences and deductions, in light of their experience). An officer trained in the detection of crimes and violations involving alcohol, including underage consumption, could reasonably believe that the person who had entered the store had supplied the person outside the store with liquor because he was not old enough to enter the store himself. That the officers could not see exactly what the two men exchanged did not eliminate this reasonable suspicion. *See, e.g., United States v. Sholola*, 124 F.3d 803, 813 (7th Cir. 1997) (observing that the reasonable suspicion standard, by its very nature, allows for some degree of ambiguity or

---

[3] The Defendant testified that he stayed outside, not to hide from any store clerk, but because he wanted to finish the cigarette he was smoking and could not do so inside the store. During Officer Drake's testimony, he did not make any reference to the Defendant smoking. Rather, he stated that the Defendant's chosen location on the side of the building seemed odd (Hr'g Tr. 11) and that, after observing the exchange, it was one of the factors that heightened his suspicion that the two men were engaged in illegal furnishing. When Officer Schwartzhagen was asked whether the Defendant was smoking when he was standing by the pay phone on the side of the building, he stated that he could not recall. (Hr'g Tr. 103.)

uncertainty).

Based on the totality of circumstances, including the occurrence of an exchange outside a liquor store under cover of night, the apparent ages of the individuals, and the second person waiting outside, a person of reasonable caution would believe that the officer's actions in detaining the two men to investigate their ages were appropriate, and the stop was justified at its inception. Not only must a stop be justified at its inception, but to ensure that the seizure resulting from an officer's investigation based upon reasonable suspicion is constitutional, a *Terry* stop must be limited so that it is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. For example, the seizure cannot continue for an excessive period of time or resemble a traditional arrest. *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185–86 (2004) (citing *United States v. Place*, 462 U.S. 696, 709 (1983), and *Dunaway v. New York*, 442 U.S. 200, 212 (1979)). Upon stopping the two men, the police quickly learned that Marsh was underage and had committed a violation by simply going into the liquor store. *See* Ind. Code § 7.1-5-7-10 (making it a Class C misdemeanor for a minor to recklessly be in liquor store or for a liquor store to recklessly permit a minor to be inside the store beyond a reasonable time to check identification and confirm his age). Based on these events, it was reasonable for the police to walk the short distance back to the store to further investigate Marsh's actions as well as those of liquor store personnel. Indeed, there was probable cause to detain Marsh for the violation. The Defendant argues that after learning that Marsh was underage, there was no reason to suspect that the two engaged in furnishing. He further contends that Marsh's explanation that he purchased condoms, along with his receipt for condoms, should have ended the matter as far as the Defendant was concerned.

10

The Defendant argues that requiring him to accompany the officers across the street to the liquor store was excessive and shifted the detention from an investigatory stop to a *de facto* arrest that required probable cause. (Def. Reply 5, DE 26.)

The Defendant takes issue with having to move across the street to the liquor store parking lot. However, because this move did not render the stop more intrusive than it was at its inception, *see United States v. Vanichromanee*, 742 F.2d 340, 345 (7th Cir. 1984) (holding that moving a stop to a location that is not more institutional is unlikely to raise the intrusiveness of the stop to the level of an arrest), it appears that the Defendant's real argument is that the duration of the stop, as opposed to its location, was unreasonable, *see id.* (stating that "[t]he test for determining whether the length of the detention is lawful is the reasonableness of the time involved"). The Defendant estimates that he was detained twenty minutes before he was arrested. The Seventh Circuit has instructed that "[t]here is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006).

The Defendant was detained only as long as was necessary to learn his true identity, at which time the police had probable cause to arrest him based upon the active warrant. To overcome the obvious conclusion that the stop was thus reasonable and not a violation of his rights, the Defendant argues that it was not necessary for the officers to know his identity and not proper for them to seek it. Instead, they should have allowed him to leave after learning that Marsh was twenty years old and had only purchased condoms in the liquor store.

The Court does not agree with the Defendant's argument. It was reasonable for Officer

11

Drake to continue his attempts to learn the Defendant's name after he did not have any identification, refused to provide his name, and then gave a name that did not appear in Officer Drake's database. Officer Drake testified that he was interested in the Defendant as a witness to the violations by Marsh and Belmont. Additionally, a reasonable officer would be justified in suspecting that Marsh had illegally provided the Defendant with items from the store because the officers were not required to believe, without further investigation, Marsh's explanation that he had only bought condoms. At this time, the Defendant had not given his name or date of birth, so with the information the officers had at the time they could not rule out the possibility that he was also underage and had received alcohol that Marhs bought in the liquor store.[4] Moreover, the Supreme Court has held that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel*, 542 U.S. at 186 (stating that "[o]btaining a suspect's name in the course of a *Terry* stop serves important government interests," including to "inform an officer that a suspect is wanted for another offense").

When the name the Defendant provided did not show up on Officer Drake's computer, a reasonable officer would suspect that the name might be fictitious. Even if this was not sufficient to raise suspicions about the Defendant's own criminal conduct as it related to the liquor store, it is a violation of Indiana law to knowingly provide false information to police who are investigating a crime or the possibility of criminal activity. *See* Ind. Code § 35-44-2-2(d)(1) (false informing); *Taylor v. State*, 891 N.E.2d 155, 160 (Ind. Ct. App. 2008) (explaining that officers investigating the possibility of criminal activity were conducting an official investigation

---

[4] As it turns out, the Defendant did have a bottle of liquor on him at the time of the stop, which officers discovered after he was arrested. The Defendant testified that he bought it earlier that night at the same Belmont Beverage store. There was no liquor found on Marsh.

12

within the meaning of the false informing statute). Thus, providing the officers with a fictitious name during their investigation of Marsh's violation became a separate offense, and it was reasonable for Officer Drake to investigate the matter further. As part of this investigation, he arranged for a search of a more comprehensive police database. The results of this search provided additional bases to suspect that the Defendant had not provided his real name. It also revealed that someone with the same birth date and a consistent physical description had an active warrant for his arrest. Officer Drake attempted to verify whether the person he was questioning had a scar, which would provide further information to support the growing suspicion that the Defendant had provided a false name.

Officer Drake was diligent in pursuing a means of investigation that was likely, first, to confirm or dispel his suspicion that the Defendant was under twenty-one years old, and, second, to confirm or dispel the developing suspicion that the Defendant provided him a fake name. Officer Drake's inquiry about the Defendant's identification was a common sense inquiry that was relevant to the purpose of the stop. The evasive actions of the Defendant then caused additional delay. Although Officer Drake may have still required the assistance of Officer Hoffman to search the Spillman system to learn about the warrant, he would have discovered it shortly after stopping the Defendant if the Defendant had provided his real name. With the Defendant's evasiveness added into the mix, the twenty or so minutes it took to verify the Defendant's identification and discover the warrant was not unreasonable. For these reasons, there is no basis to exclude the evidence found on the Defendant after his arrest as fruit of an unlawful search.

The circumstances of this case present another reason to deny the Defendant's Motion to

Suppress. Even if the Court were to conclude that the stop and resulting detention were illegal, the evidence would still be admissible at a trial against the Defendant because evidence seized as a result of an unlawful stop and detention "may be introduced into evidence at trial if intervening circumstances establish that the evidence came about without exploitation of that illegality and instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Johnson*, 383 F.3d 538, 544 (7th Cir. 2004) (quoting *United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997) and *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (quotation marks and brackets omitted). A lawful arrest pursuant to a warrant constitutes an intervening circumstance that dissipates any taint caused by a stop that lacks reasonable suspicion. *Id.* at 544–45 (holding that once officer identified driver of car stopped without reasonable suspicion as a person previously known to him to be the subject of an outstanding warrant, the officer had probable cause to arrest the defendant independent of the initial stop); *Green*, 111 F.3d at 521–23 (holding that intervening circumstance of an active arrest warrant, because it was not outweighed by flagrant official misconduct, dissipated any taint caused by the illegal stop). As the Seventh Circuit has explained, it "would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant." *Green*, 111 F.3d at 521. Even if the stop was without reasonable suspicion or was longer than reasonable, the discovery of the drugs and gun did not result from police exploiting an illegal detention, but from the execution of a valid arrest warrant, and should not be suppressed.

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Suppress Evidence [DE 13] is DENIED. A telephonic final pretrial conference is set for Monday, January 12, 2009, at 3:00 PM before Judge Theresa L. Springmann. The Court will initiate the call. A two day jury trial is scheduled for Tuesday, January 20, 2009, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on December 1, 2008.

S/ Theresa L. Springmann
THERESA L. SPRINGMANN, JUDGE
UNITED STATES DISTRICT COURT